IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DG COGEN PARTNERS, LLC, a
Delaware company, and 1211658                     No.  03:11-cv-00642-HZ
ALBERTA LTD, a Canadian
corporation,

              Plaintiffs,

      v.                                         OPINION & ORDER

LANE POWELL PC, a Washington
corporation, and JONATHAN
NORLING,

             Defendants.


Peter R. Jarvis
Dayna E. Underhill
HINSHAW & CULBERTSON LLP
1000 S.W. Broadway, Suite 1250
Portland, Oregon 97205-3000

      Attorneys for Plaintiff


1 - OPINION & ORDER

David B. Markowitz
Renee E. Rothauge
Kerry J. Shepherd
MARKOWITZ, HERBOLD, GLADE
     & MEHLHAF, P.C.
1211 S.W. Fifth Avenue, Suite 3000
Portland, Oregon 97204-3730

     Attorneys for Defendant Lane Powell PC

Larry A. Brisbee
BRISBEE & STOCKTON LLC
139 N.E. Lincoln Street
P.O. Box 567
Hillsboro, Oregon 97123-0567

     Attorney for Defendant Jonathan Norling

HERNANDEZ, District Judge:

     Plaintiffs DG Cogen Partners, LLC ("DG Cogen") and 1211658 Alberta LTD ("Alberta")

bring this legal malpractice action against defendants Lane Powell PC and Jonathan Norling, one

of its former attorneys.  Defendants move for partial summary judgment, making seven separate

arguments on a variety of issues.[1]  I grant the motion in part and deny it as moot in part.  After

defendants filed the summary judgment motion, plaintiffs moved for leave to amend the First

Amended Complaint.  I grant the motion to amend.

## BACKGROUND

     DG Cogen is in the "cogeneration" energy business.  A cogeneration system generates

electricity and uses the excess heat from the system's engine for other purposes such as heating

---

    [1] As I understand the motion, defendants seek partial summary judgment because even if
all seven motions are granted, DG Cogen will still have a claim for $10,000 in damages for funds
it spent on other counsel in an attempt to defeat a motion made in a separate proceeding
described more fully herein.

2 - OPINION & ORDER

water.  In 2000, Hess Microgen LLC ("Hess Microgen"), sold certain cogeneration systems to RealEnergy.  Ex. 8 to Fox Decl.  The cogeneration systems included engine heads manufactured by Daewoo Heavy Industries America Corporation, whose successor in interest is Doosan Infracore America Corporation.

In 2004, DG Cogen bought the cogeneration systems from RealEnergy.  Ex. 9 to Fox Decl.  At approximately the same time, DG Cogen and Hess Microgen Services, Inc. ("Hess Services"), entered into a Long Term Services Agreement (LTSA) in which Hess Services agreed to repair and maintain the cogeneration systems.  Ex. 11 to Fox Decl.

In December 2005, Alberta became a secured creditor of DG Cogen.  Details about Alberta's acquisition of DG Cogen's interests are discussed below.

In March 2006, Hess Services initiated arbitration against DG Cogen to collect money Hess Services alleged DG Cogen owed to it under the LTSA.  The LTSA mandated dispute resolution through arbitration.  Norling represented DG Cogen in that arbitration.  Norling joined Lane Powell on May 1, 2006.

In July 2007, shortly before the arbitration proceeding was to commence, lawyers for the parties to the arbitration told the arbitrator that a settlement had been reached.  Over the next several months, the precise terms of the written settlement were negotiated.  The proposed settlement terms included mutual release language.

On July 3, 2008, an attorney for Hess Services sent an email to Norling and Milo Petranovich, another attorney at Lane Powell, stating that if they failed to have a signed settlement agreement in the arbitration by July 10, 2008, Hess Services would apply to the

3 - OPINION & ORDER

arbitrator to enter an award in its favor.  Norling forwarded the email to Bradley Kruper[2], asking

him how he wanted to handle the request from Hess Services and noting that Lane Powell

"desires to withdraw as counsel of record."  Ex. 21 to Fox Decl.  Bradley Kruper forwarded the

email to James Hannah, a lawyer at King & Spalding LLP.  Id.  Bradley Kruper told Hannah that

this "Hess arbitration issue" related to the "current lawsuit."  Id.

That same day, July 3, 2008, DG Cogen filed a lawsuit in the United States District Court

for the Northern District of California against Hess Microgen, "Hess Corporation," Daewoo,

Doosan, Advanced Power Distributors, Inc., and Does 1-100 ("the King & Spalding Action").

Ex. 22 to Fox Decl.  DG Cogen was represented by King & Spalding.  Defendants represent that

"Hess Corporation" was Hess Microgen's parent.

In that action, DG Cogen brought fourteen claims:  unfair competition and false

advertising under the Lanham Act, breach of contract, breach of the implied covenant of good

faith and fair dealing, breach of express warranty, breach of implied warranty of fitness for a

---

[2]  In an October 11, 2012 Declaration submitted in opposition to defendants' summary judgment motion, Bradley Kruper identifies himself as the current president of Alberta.  B. Kruper Decl. at ¶ 2.  He also states that at all material times, he has been, and presently is, authorized to speak and act on behalf of DG Cogen with respect to all matters that have been or are at issue in this litigation.  Id.

Other documents in the record have identified him as (1) president of DG Cogen; Ex 54 to Fox Sec. Decl. (July 6, 2006 letter from B. Kruper); (2) the chief financial officer of an entity called "Simmax"; Ex. 45 to Fox Decl. (May 2008 Decl. of B. Kruper submitted in separate litigation); (3) the president of Alberta; Id.; and (4) being affiliated with "Simmax Energy"; Ex. 41 to Fox Decl. (Aug. 6, 2008 letter to B. Kruper from Lane Powell).

Simmax was a company which operated property on behalf of DG Cogen.  Ex. 45 to Fox Decl. (May 2008 B. Kruper Decl. submitted in separate litigation).  It appears that Simmax and DG Cogen shared a mailing address.  Ex. 41 to Fox Decl. (Aug. 6, 2008 letter from Lane Powell to B. Kruper of "Simmax Energy" addressed to 3202 W Warner Avenue in Santa Ana, California); Ex. 54 to Fox Sec. Decl. (July 6, 2006 letter from B. Kruper on DG Cogen letterhead with same address and listing an email address as "www.simmax.com").

particular purpose, breach of implied warranty of merchantability, unconscionability, fraud, fraudulent inducement, negligent misrepresentation, tortious interference with contract, negligent interference with contract, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage.  Id.   Among other things, DG Cogen alleged that the "Hess defendants" fraudulently induced DG Cogen to purchase the cogeneration systems from RealEnergy, and to sign the LTSA with "Hess" by representing and warranting that the cogeneration systems would operate and run at the specifications set forth in "Hess's" technical and design specification sheets.  Id.  DG Cogen also alleged that Daewoo fraudulently induced DG Cogen to purchase a series of engine head replacements from defendant Advanced Power Distributors, a Daewoo distributor.  Id.

On July 9, 2008, Bradley Kruper sent an email to Ellen Smith of Hess[3] stating that DG Cogen would not consent to the arbitration settlement agreement.  Ex. 24 to Fox Decl.  In the email, Bradley Kruper expressly stated that DG Cogen would not agree to the waiver of claims language.  Id.  On August 1, 2008, Hess Services applied to the arbitrator for issuance of an award enforcing the settlement.  Ex. 25 to Fox Decl.  King & Spalding represented DG Cogen in opposing this application.

On August 22, 2008, DG Cogen filed an Amended Complaint in the King & Spalding Action.  Ex. 7 to Fox Decl.  In the Amended Complaint, Alberta was added as a plaintiff, and the

---

[3]  The references to the various Hess entities are confusing.  I refer to Hess Microgen or Hess Services when the particular entity's identity is clear.  In the July 9, 2008 email to Smith, it is unclear which Hess entity Smith worked for.  She is identified in a July 14, 2006 letter as "President" on letterhead that refers to "Hess" and "Hess Microgen LLC," but she signed her name under a reference to "Hess Microgen Services, Inc."  Ex. 55 to Fox Sec. Decl.

5 - OPINION & ORDER

Daewoo and Doosan companies were sued in slightly different names.[4]  Id.  The fourteen claims appear to be the same as those brought in the original King & Spalding Action Complaint.  Id.

On September 30, 2008, the arbitrator issued an interim award in the LTSA arbitration between Hess Services and DG Cogen, granting Hess Services's application for enforcement of the settlement agreement.  Ex. 17 to Fox Decl.

On the advice of King & Spalding that the arbitration settlement agreement prohibited plaintiffs' pursuit of any claims against Hess Microgen and Hess Corporation in the King & Spalding Action, and that the lawsuit was of limited value without the Hess defendants, plaintiffs voluntarily dismissed the King & Spalding Action, including the claims against Daewoo and Advanced Power, on October 9, 2008.  Exs. 28, 29, 30, 31 to Fox Decl.

On December 17, 2008, the arbitrator issued a Final Award in the LTSA arbitration which was consistent with the interim award.  Ex. 27 to Fox Decl.

On May 26, 2011, plaintiffs filed the instant action against defendants.  They allege that without express or implied authority to do so, and without informing plaintiffs that they were doing so, defendants caused or allowed plaintiffs to commit themselves to an unreasonably unfavorable release of all potential claims against Hess Microgen, Hess Services, or any other Hess entity, as part of the settlement of claims arising under the LTSA.  First Am. Compl. at ¶

---

[4]  The First Amended Complaint in the King & Spalding Action named the following defendants, in addition to Hess Microgen and Hess Corporation:  (1) Doosan Infracore Co. Ltd., formerly known as Daewoo Heavy Industries & Machinery Ltd.; (2) Doosan Infracore America Corporation, formerly known as Daewoo Heavy Industries America Corporation; and (3) Advanced Power Distributors, Inc.  Ex. 7 to Fox Decl. Plaintiffs in the King & Spalding Action alleged that Daewoo Heavy Industries & Machinery changed its name to Doosan Infracore Co Ltd. in 2005, and that Doosan America was formerly known as Daewoo Heavy Industries Corporation.  Id. at ¶¶ 5, 6.  In this Opinion, I refer to the Daewoo and Doosan entities as "Daewoo."

14.  They further allege that defendants breached their duties of care in terms of (1) "the legal advice given (or not given) to Plaintiffs in connection with the settlement of the Arbitration," (2) "the failure to communicate adequately (or sometimes at all) with Plaintiffs in connection with the settlement of the Arbitration," and (3) "the actions taken (or not taken) in connection with binding Plaintiffs to the settlement of the Arbitration under extremely unfavorable terms."  Id. at ¶ 14a.  They also allege that defendants breached their duties of care by failing to provide (in the case of Lane Powell), or request (in the case of Norling), assistance to Norling in the representation of plaintiffs in light of Norling's lack of adequate skills and experience to handle the matter essentially on his own.  Id. at ¶ 14b.

Plaintiffs allege that had defendants not breached these duties, the LTSA settlement would not have occurred as it did, and a settlement or litigated resolution of the arbitration over the LTSA would not have foreclosed plaintiffs' ability to pursue damage claims against Hess Microgen and other Hess entities.  Id. at ¶¶ 14c, 14d.  Plaintiffs contend that as a direct result of defendants' breaches of duty, Hess Services and Hess Microgen were able to obtain an order in the arbitration prohibiting pursuit of the King & Spalding Action against Hess Microgen, rendering plaintiffs unable to pursue those claims.  Id. at ¶ 16.  If plaintiffs had been able to pursue those claims, plaintiffs would have recovered many millions of dollars of damages, plus pre- and post-judgment interest.  Id. at ¶ 15.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and

7 - OPINION & ORDER

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial."  <u>Fed. Trade Comm'n v. Stefanchik</u>, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation omitted).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  <u>Celotex</u>, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  <u>Suever v. Connell</u>, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the light most favorable to the nonmoving party.  <u>Long v. City & Cnty. of Honolulu</u>, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

DISCUSSION

I.      Defendants' First Summary Judgment Motion:  Lack of Standing of DG Cogen in
        King & Spalding Action

Before the King & Spalding Action was filed in July 2008, Alberta had obtained DG Cogen's assets through foreclosure.  Defendants argue that the King & Spalding Action was one

of those assets.  As a result, defendants argue that DG Cogen lacked standing to pursue any claims in the King & Spalding Action.  Accordingly, the argument continues, as a matter of law, defendants' alleged negligence relating to the LTSA arbitration settlement did not cause DG Cogen to lose the value of the King & Spalding Action given that DG Cogen should have been dismissed from that action having previously lost through foreclosure any claims against the Hess defendants that DG Cogen once possessed.  Therefore, defendants maintain, DG Cogen cannot recover from defendants in this case the sums plaintiffs sought under the various claims asserted in the King & Spalding Action.[5]

There is no dispute between the parties that to prevail on a legal malpractice claim plaintiff must establish "(1) a *duty* that runs from the defendant to the plaintiff; (2) a *breach* of that duty; (3) a resulting *harm* to the plaintiff measurable in damages; and (4) *causation, i.e.*, a causal link between the breach of the duty and the harm."  Stevens v. Bispham, 316 Or. 221, 227, 851 P.2d 556, 560 (1993).  A plaintiff must show "not only that the attorney was negligent, but also that the result would have been different except for the negligence."  Watson v. Meltzer, 247 Or. App. 558, 565, 270 P.3d 289, 293 (2011) (internal quotation marks omitted), rev. denied, 352 Or. 266, 286 P.3d 1231 (2012).  A legal malpractice plaintiff must "demonstrate that, but for the

---

[5]  In Paragraph 17a of the First Amended Complaint in this malpractice action, plaintiffs seek as damages the sums plaintiffs would have recovered under the following claims brought in the King & Spalding Action:  breach of contract against Daewoo and Advanced Power Distributors, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, fraud, fraudulent inducement, and negligent misrepresentation, all brought against all of the defendants.  First Am. Compl. at ¶ 17a (including the express warranty claim which the parties agree was mistakenly omitted from the First Amended Complaint due to a scrivener's error).  Plaintiffs do not seek to recover damages for any other claims brought in the King & Spalding Action.

malpractice of the defendant, he or she would have obtained a more favorable result[.]" <u>Id.</u> at 566, 270 P.3d at 294.

When the outcome of the underlying case depends on factual issues, the malpractice case jury must determine "what the outcome for plaintiff *would have been* in the earlier case if it had been properly tried." <u>Id.</u> at 567, 270 P.3d at 294 (internal quotation marks omitted). When the outcome of the underlying case depends on the resolution of a legal issue, "the appropriate focus of the reviewing judge [is] what the outcome *should* have been if the issue had been properly presented." <u>Id.</u> (internal quotation marks omitted).

On July 23, 2004, DG Cogen became a party to a Security Agreement with First American Bank, SSB, a state savings bank located in Dallas, Texas. Ex. 33 to Fox Decl. First American Bank lent DG Cogen $19,550,000 and took a security interest in thirteen types of personal property belonging to DG Cogen, including general intangibles, collectively referred to as "the Collateral." <u>Id.</u> The Security Agreement provides that it "shall be governed and construed according to and determined under the laws of the State of Texas." <u>Id.</u> at § 10.9.

On July 27, 2004, a UCC Financing Statement was filed with the State of Delaware showing DG Cogen as the debtor and First American Bank as the secured party in regard to all of DG Cogen's "personal property," referred to as "the Collateral," and listing several categories of property, including general intangibles. Ex. 32 to Fox Decl. The UCC Financing Statement further defines "general intangibles" to include "all other choses in action and causes of action." <u>Id.</u>

10 - OPINION & ORDER

An April 29, 2008 "Intercreditor Agreement" among Bradley Kruper, Daryl Kruper[6], Alberta, and others shows that Citibank Texas succeeded First American Bank as the secured party and then assigned all of its rights under the loan and related documents, including the Security Agreement, to Alberta in December 2005. Ex. 35 to Fox Decl. Thus, Alberta became the secured party under the Security Agreement at that time. Id. In March 2006, Alberta became DG Cogen's sole member. Ex. 14 to Fox Decl.

On May 8, 2008, Alberta sent a letter/notice of default to DG Cogen and demanded "the Collateral" as that term was defined in the 2004 Security Agreement. Ex. 34 to Fox Decl. Alberta stated that unless all of the collateral was assembled and turned over to Alberta as demanded, Alberta would "have no alternative but to take immediate action to enforce its rights and remedies in and to the Collateral, including without limitation, seeking the immediate appointment of a receiver to take possession, preserve and protect the Collateral pending its foreclosure or other disposition thereof for benefit of Alberta[.]" Id.

On May 21, 2008, Alberta issued a "Notice of Public Foreclosure Sale" to occur on Friday, June 6, 2008, at the offices of Alberta's counsel in Los Angeles. Ex. 37 to Fox Decl. The notice was issued under Texas Business & Commercial Code § 9.610. Id. It indicated that the collateral would be sold by the secured party (meaning Alberta), at public auction to the highest bidder. Id. At the conclusion of that sale, Alberta obtained ownership of DG Cogen's collateral.

---

[6] Daryl Kruper was identified in a May 2008 memorandum submitted by Simmax in unrelated litigation against Simmax and DG Cogen as the president of DG Cogen. Ex. 45 to Fox Decl. At about that same time, an email sent by Daryl Kruper carried a "simmax" email address as well as a signature block with Alberta's name. Ex. 43 to Fox Decl. Defendants identify Daryl Kruper as "Alberta's agent responsible for the DG Cogen assets[.]" Defs.' Reply Mem. at 12.

See Ex. 38 to Fox Decl. (Dec. 24, 2009 Opinion Letter from Alberta's counsel to 808 Energy 3, LLC, stating, *inter alia*, that Alberta "acquiesced title [] in and to the accounts, receivables, chattel paper, deposit accounts, equipment and related parts and inventory, securities, documents, instructions and general intangibles of DG Cogen Partners, LLC, pursuant to a foreclosure proceeding conducted pursuant to applicable law effectuated on June 8, 2008").

Defendants assert that under the express terms of the Security Agreement, Texas law governed the foreclosure sale of DG Cogen's assets and the validity of the claims assigned via the foreclosure. Generally, "[c]auses of action in Texas are freely assignable." City of Brownsville ex rel. Pub. Utils. Bd. v. AEP Tex. Cent. Co., 348 S.W. 3d 348, 358 (Tex. App. 2011), reh'g overruled (Aug. 29, 2011), rev. denied (May 11, 2012); see also State Farm Fire & Cas. Co. v. Gandy, 925 S.W.2d 696, 707 (Tex. 1996) ("free alienation of choses in action [is] the general rule").

Under Article III of the Constitution, DG Cogen must have suffered an "injury-in-fact," meaning the "invasion of a legally protected interest[.]" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Because, defendants argue, DG Cogen had no legally protected interest in the claims asserted in the King & Spalding Action when it was filed on July 3, 2008, DG Cogen had no Article III standing to pursue those claims and thus, the federal court in the Northern District of California should have dismissed DG Cogen from that action. As a result, defendants did not cause DG Cogen to lose the value of the King & Spalding Action because DG Cogen should have been dismissed from the case regardless of defendants' alleged negligence. E.g., Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 420, 425 (3d Cir. 1999) (plaintiff,

which had previously assigned its rights under a contract, brought a breach of contract action;

court concluded that it was unambiguous that the plaintiff had completely assigned its right to

enforce payment and thus, the plaintiff lacked standing to sue the defendant).

Plaintiffs do not dispute that Texas law applies and that the assignment of the King &

Spalding Action from DG Cogen to Alberta is permissible under Texas law.  Plaintiffs appear to

take no issue with the argument that if DG Cogen actually assigned its interest in the King &

Spalding Action to Alberta, DG Cogen should have been dismissed from the King & Spalding

Action because DG Cogen would have lacked standing to pursue the claims brought in that

action.

Plaintiffs dispute, however, that any assignment of the King & Spalding Action to Alberta

actually occurred.   In support, plaintiffs rely on the declarations of Simon Aron, Bradley Kruper,

and James Hannah.

Aron was lead counsel for Alberta in regard to the June 2008 foreclosure of DG Cogen's

assets.  He acknowledges that at and before the June 2008 foreclosure, Alberta owned a security

interest in all of DG Cogen's assets, having acquired those interests by assignment from a prior

lender to DG Cogen in December 2005.  Aron Decl. at ¶ 5.  He notes that the interests of Alberta

and DG Cogen were "aligned because Alberta was the sole member of DG and . . . had become

DG's only secured creditor."  Id. at ¶ 4.  He states:

> Consistent with its interests, Alberta expressly and consciously chose NOT to
> foreclose on all DG assets in June 2008.  More specifically, Alberta expressly and
> consciously chose to foreclose on what were the tangible, hard assets owned by
> DG (such as the cogeneration units at specific sites and spare parts) and the
> related site-specific assets (such as the contracts between DG and the individual
> site owners).  By contrast, Alberta expressly and consciously chose NOT to

13 - OPINION & ORDER

foreclose on other, intangible DG assets such as the claims that DG might have against one or more Hess entities or others, either within or outside of the then-pending arbitration over the Long Term Service Agreement (or LTSA) and the then-anticipated complaint against Hess and others which was filed by King & Spalding on behalf of DG in early July 2008 (the "King & Spalding Complaint"). Therefore, those claims and issues remained assets owned entirely by DG.

Id. at ¶ 6.

In support of his statements, Aron cites to portions of three documents for the proposition that a creditor is "not required to take an all-or-nothing approach to foreclosure[,]" but may instead choose to foreclose only on some assets and not others.  Id. at ¶ 5 (citing to (1) the portion of the Loan Agreement between DG Cogen and First American Bank providing that in the event of default by DG Cogen, the lender may exercise any of its rights under the any of the loan documents; (Ex. 10 to Fox Decl., § 10 "Remedies"); (2) the portion of the Security Agreement between DG Cogen and First American Bank which indicates that the secured party may exercise certain rights in the event of a default; (Ex. 33 to Fox Decl., § 5 "Secured Party's Rights"); and (3) a section of the Notice of Public Foreclosure Sale addressing how the proceeds of the sale were to be applied, including that the "Secured Party does not have or assume any obligation to foreclose upon any or all of the Collateral prior to proceeding against Debtor and/or any of the other Obligors" (Ex. 37 to Fox Decl.)).  The problem, however, is that this proposition is undisputed and not determinative of the issue.  Simply because Alberta had the right to selectively foreclose does not mean that it did selectively foreclose.

Bradley Kruper states that

[t]here are no contracts or agreements transferring any or all of the claims included in the King & Spalding Complaint from DG to Alberta, nor, as I understood the matter at the time, would there have been any reason to do so.  It

14 - OPINION & ORDER

was always both Alberta's and DG's intention to leave the right to pursue any and
all Hess-related claims solely with DG, and that is what we did.

B. Kruper Decl. at ¶ 10; see also id. at ¶ 9 (stating that Aron explained the goal was to have

Alberta acquire the "hard" or "site-specific" assets).  In a footnote, he adds that when King &

Spalding added Alberta as a plaintiff in the Amended Complaint in the King & Spalding Action,

he understood this to be "part of a precautionary approach rather than something that had to be

done."  Id. at ¶ 10 n.2.

Hannah was an associate at King & Spalding at the time the King & Spalding Action was

filed.  Hannah Decl. at ¶ 1.  He states that in July and August 2008, he was "aware that Alberta

had the ability to foreclose on some of DG's assets."  Id. at ¶ 2.  He recalls discussions with

Bradley Kruper about whether DG Cogen, Alberta, or both might be proper plaintiffs in the

litigation.  Id.  He further states that "[a]lthough I no longer remember the specifics of this

analysis or the discussions, I believe that DG was the proper plaintiff in the litigation and that

Alberta had not foreclosed on DG's interest in the litigation."  Id. at ¶ 3.  According to Hannah,

the Amended Complaint in the King & Spalding Action added Alberta as a plaintiff not because

DG did not own the claims or had assigned them to Alberta, but instead as a "purely protective

measure in order to avoid a potential challenge on this ground and because Alberta could

theoretically choose in the future to foreclose on some or all of these claims."  Id. at ¶ 4.

Based on these declarations, plaintiffs argue that Alberta deliberately chose to foreclose

only on DG Cogen's "hard" assets (meaning site-specific equipment and related parts and the

contracts relating to that equipment), but did not foreclose on other assets, including the claims in

the then-forthcoming King & Spalding Action.  Plaintiffs contend that at a minimum, the three

15 - OPINION & ORDER

declarations create material issues of fact as to whether DG Cogen assigned, or was foreclosed out of, the claims in the King & Spalding Action.

Defendants argue that the declarations fail to create an issue of fact because they are conclusory and unsupported and are contradicted by the relevant contemporaneously-generated records. I agree with defendants.

In the Ninth Circuit, "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978); see also United States v. Wilson, 881 F.2d 596, 601 (9th Cir. 1989) (self-serving and conclusory declarations of fact are insufficient to raise a genuine issue of fact); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data"); Calif. ex rel. Dep't of Transp. v. United States, 561 F.2d 731, 733 n.4 (9th Cir. 1977) (stating same rule; concluding that conclusory declaration did not create triable issue of disputed fact).

The relevant statement in Aron's Declaration, that Alberta chose not to foreclose on the intangible assets, is conclusory. It is unsupported by any other evidence and is contradicted by documents Aron generated in 2008 and 2009. Bradley Kruper's Declaration is similarly conclusory as it states only what the "goal" was and adds "that was what we did." These statements are also unsupported by other evidence in the record and are contradicted by the contemporaneously-generated documents. Hannah's Declaration is also insufficient. His having become "aware," from unidentified sources in July and August 2008, that Alberta could foreclose on DG Cogen's assets fails to establish that he had personal knowledge of which entity, either

DG Cogen or Alberta, actually owned the assets   Additionally, aside from the fact that Hannah admits he cannot remember the specifics of any analysis or discussion of the issue, he offers only a conclusory statement that DG Cogen was the proper plaintiff because Alberta had not foreclosed on DG Cogen's interests.  Like the statements by Aron and Bradley Kruper, Hannah's statement is conclusory, unsupported by other facts in the record, and is contradicted by the contemporaneously-generated documents.

Statements of what Alberta may have subjectively <u>intended</u> do not create an issue of fact regarding what actually occurred.  In <u>Klopfenstein v. Pargeter</u>, 597 F.2d 150 (9th Cir. 1979), the plaintiff and defendant were parties to an oral agreement to jointly seek a fast food franchise. After meeting with representatives of the franchisor, preparing to incorporate their business, and arranging for a bank loan, the defendant wrote to the plaintiff stating he was severing their joint efforts because of dissatisfaction between them.  <u>Id.</u> at 151.  The plaintiff never replied to the letter, but he did inform the franchisor and the bank by letter that the joint applications were to be withdrawn and that he would compete with the defendant for the franchise.  <u>Id.</u>  The plaintiff took no action to protest the defendant's withdrawal from the joint venture or to reconcile his differences with the defendant.  <u>Id.</u>  Within six months, the defendant secured the franchise.  <u>Id.</u>

A couple of years later, the plaintiff filed suit, alleging that the defendant's letter severing their efforts was a breach of the joint venture agreement and that therefore, the defendant held a half-interest in the franchise as a constructive trust for the plaintiff.  <u>Id.</u>  The Ninth Circuit affirmed the district court's grant of summary judgment to the defendant.  The court noted that the plaintiff's inaction, along with his letters to the bank and the franchisor, showed that he

construed the defendant's letter as an offer to rescind and accepted it, or, he chose to abandon the joint venture when he realized that the defendant was dissatisfied.  <u>Id.</u>

The court rejected the plaintiff's argument that the plaintiff's own affidavit raised a material issue of fact.  <u>Id.</u>  In the affidavit, the plaintiff averred that he did not intend to rescind or abandon the contract.  <u>Id.</u>  This statement was insufficient to create an issue of fact:  "the affidavit does not point to any conduct from which [the defendant] or anyone else could infer that this was [the plaintiff's] intention."  <u>Id.</u>  The plaintiff's "conduct unequivocally implied that he no longer intended to follow through with the joint venture, but instead intended to seek the franchise alone or with a new partner."  <u>Id.</u> at 151-52.  According to the court, "[u]ndisclosed, subjective intentions are immaterial in this commercial transaction, especially when contradicted by objective conduct."  <u>Id.</u> at 152.

Both Bradley Kruper's and Aron's current statements about what Alberta intended in 2008 are, under <u>Klopfenstein</u>, incapable of creating an issue of fact on the asset foreclosure by Alberta, especially when they are contradicted by the documents generated and the statements made in 2008 and 2009.  The underlying Security Agreement and UCC Financing Statement include general intangibles as part of the definition of the collateral.  The UCC Financing Statement defines general intangibles as including choses in and causes of action.  Aron's May 8, 2008 letter/notice of default includes multiple references to "all of the Collateral."  The May 21, 2008 Notice of Public Foreclosure specifically states that the public auction includes the sale of general intangibles.  Aron's December 2009 Opinion Letter confirms that all of these assets were indeed foreclosed upon by Alberta in June 2008.

18 - OPINION & ORDER

Finally, Alberta conveyed assets to 808 Energy 3, LLC in an October 2009 Asset

Purchase Agreement. Ex. 36 to Fox Decl. Section 3 of that agreement governs the purchase and

sale of assets. The particular types of assets are listed by category in Section 3.1(a)-3.1(l). Id.

One of those categories is "previously-commenced lawsuits and other proceedings." Id.

at 11 (Section 3.1(f)). There, the agreement states that except for those lawsuits set forth on

Schedule 3.1(f), referred to as the "Retained Lawsuits and Other Proceedings," all rights to any

recoveries under any lawsuit commenced by Alberta or a predecessor in interest of Alberta,

before the closing date, were conveyed to 808 Energy. Notably, the King & Spalding Action is

listed on Schedule 3.1(f) (listed as "1211658 Alberta Ltd vs Hess Microgen/Amerada Hess

Crop/Doosan"), as a retained lawsuit. Id. at 110.

I agree with defendants that the exception of the King & Spalding Action from the assets

transferred from Alberta to 808 Energy reinforces the only reasonable conclusion derived from

the other contemporaneously-generated documents: Alberta owned the King & Spalding Action

at that time. If Alberta had not obtained ownership of the action via its June 2008 foreclosure of

DG Cogen's assets, there would have been no need to exempt it from the transfer to 808 Energy

in the October 2009 Asset Purchase Agreement.

The documents unambiguously demonstrate that Alberta acquired DG Cogen's general

intangibles, including the claims in the King & Spalding Action, as of June 8, 2008. Plaintiffs'

declarations, the only evidence plaintiffs offer in opposition, do not create a genuine issue of

material fact. They are conclusory and contradicted by contemporaneously-made documents.

While they express what plaintiffs may have intended, under Klopfenstein, such an intent

expressed in a declaration filed in later litigation, cannot create an issue of fact, especially when contradicted by the documents.

I grant this part of defendants' summary judgment motion because DG Cogen was not a proper plaintiff in the King & Spalding Action and should have been dismissed from that case for a lack of standing.  As a result, DG Cogen cannot prevail in the part of the malpractice claim in which it seeks as damages the sums allegedly recoverable in the King & Spalding Action.

II.    Defendants' Second Summary Judgment Motion:  Alberta Lacks Standing to Pursue DG Cogen's Malpractice Claim and Alberta Cannot Establish a Duty Running to It from Defendants

This argument has two parts:  (1)  Alberta cannot bring a malpractice claim as a successor in interest to DG Cogen because although Alberta obtained all of DG Cogen's general intangibles in June 2008 via foreclosure, Texas law prohibits assignment or transfer of a legal malpractice claim on public policy grounds, and thus, Alberta did not obtain any rights in this malpractice action by assignment/foreclosure from DG Cogen; and (2) Alberta cannot bring a malpractice claim against defendants independently because Alberta was not defendants' client and thus, there was no duty running from defendants to Alberta.

A.  Whether Alberta Received the Malpractice Claim via Assignment/Foreclosure

As noted above, the original Security Agreement executed by DG Cogen and First American Bank provides that it "shall be governed and construed according to and determined under the laws of the State of Texas."  Ex. 33 to Fox Decl. at § 10.9.  In <u>Zuniga v. Groce, Locke & Hebdon</u>, 878 S.W. 2d 313, 318 (Tex. App. 1994), the court held that "assignment of a legal malpractice action arising from litigation is invalid."  Subsequent Texas appellate cases have

20 - OPINION & ORDER

consistently followed this holding and the Texas Supreme Court has cited <u>Zuniga</u> as well.  <u>E.g.</u>,

<u>Fairfield Ins. Co. v. Stephens Martin Paving, LP</u>, 246 S.W. 3d 653, 665 n.20 (Tex. 2008) (citing

<u>Zuniga</u> with the parenthetical "holding that assignment of legal malpractice claims was against

public policy"); <u>InLiner Ams, Inc. v. MaComb Funding Group, LLC</u>, 348 S.W. 3d 1, 6 (Tex.

App. 2010) ("In Texas, assignments of legal-malpractice claims arising from litigation generally

are invalid."), <u>rev. denied</u> (June 17, 2011).

 Defendants argue that while "all collateral" once belonging to DG Cogen and then

assigned to/foreclosed by Alberta included all other choses in action and causes of action, given

the prohibition on assignment of legal malpractice claims, no assignment of any malpractice

claim belonging DG Cogen could have been assigned to Alberta.  Thus, defendants contend,

Alberta has no standing to sue defendants for malpractice as DG Cogen's successor in interest.

 I agree with defendants that Texas law applies to the determination of what assets Alberta

acquired through the foreclosure and that under that law, assignments of legal malpractice claims

are prohibited.  I reject plaintiffs' suggestion that neither the Security Agreement nor Texas law is

relevant because the malpractice claim had not accrued at the time of the foreclosure of DG

Cogen's assets.  This argument misses the mark because the issue is whether Alberta had

standing <u>as a successor in interest</u> to DG Cogen to bring this malpractice claim against

defendants.  If the assignable assets under the Security Agreement included future causes of

action, then but for the Texas policy prohibiting assignments of legal malpractice actions, the

malpractice claim would have been assigned to Alberta along with the other collateral even if the

claim had not yet accrued.  Alternatively, if the assignable assets did not include future claims,

21 - OPINION & ORDER

then Alberta could not have obtained the malpractice claim as an asset in the foreclosure. Either way, defendants are correct that Alberta cannot be a plaintiff in the malpractice action as DG Cogen's successor in interest.

Plaintiffs also argue that the Texas cases defendants rely on are factually distinguishable. They contend that because Alberta was and is DG Cogen's sole member, the interests of the two entities are "completely aligned," and because the defendants against whom this malpractice claim is brought represented both DG Cogen and Alberta[7], there is no legal or policy reason to prohibit an assignment of a malpractice claim from DG Cogen to Alberta.

The InLiner court explained that

> Texas courts have identified many reasons why the harm caused by the assignment of a legal-malpractice claim outweighs its benefits. Among other things, assignment of legal-malpractice claims could lead to commercial marketing of claims, substitution of a malpractice claim for a claim against an insolvent defendant, discouragement of voluntary settlement agreements, compromise of client confidentiality, and weakening of the attorney's duty of loyalty.

248 S.W. 3d at 8 (noting that the assignment of legal malpractice claims would lead to the marketing of such claims and would demean the legal profession) (citations omitted).

In that case, the creditor argued that the assignment of a legal malpractice claim should be unenforceable as against public policy only if it "necessitat[es] a duplicitous change in the positions taken by the parties in the underlying litigation." Id. at 8. The Texas court rejected that argument, noting that the argument would allow the assignment of malpractice claims as part of the collateral the parties had agreed could be sold by the creditor upon the debtor's default. Id.

---

[7] As explained below, plaintiffs fail to create an issue of fact as to whether Alberta was defendants' client.

The court objected to this because "treating the malpractice claims like the debtors' other assets . . . would lay the groundwork for the kind of commercial marketing criticized by the Zuniga court." Id.  The court then acknowledged the creditor's additional argument that it was not a stranger to the legal malpractice claims at issue, but it rejected that fact as material because "the result would be no less demeaning to the legal profession."  Id.

Here, the fact that DG Cogen and Alberta have interests which are "aligned" does not distinguish this case from InLiner in any meaningful way.  As the InLiner court explained, even when the creditor is not a "stranger," the fact that a malpractice claim is a "collateral" asset capable of being sold at a public foreclosure auction along with other assets, still raises public policy concerns.  Alberta, even with its interests "aligned" with DG Cogen's, filed the appropriate notice stating that all of DG Cogen's assets were going up for public sale as a result of DG Cogen's default and that Alberta was exercising its rights under the Security Agreement.  But for the public policy prohibition, Alberta would have acquired a right to the malpractice action, not as a result of having purchased DG Cogen's equity and becoming its sole member, but as a result of the foreclosure.  This implicates the public policy concerns as expressed by the InLiner court.

I grant this part of defendants' motion.  Texas law applies and assignment of the malpractice claim is prohibited by Texas law.  Alberta cannot be a plaintiff in this malpractice action as a successor in interest to DG Cogen.

B.  Whether Alberta Can Maintain the Malpractice Claim Independently

Defendants argue that Alberta cannot maintain an independent malpractice claim against them because there was no attorney-client relationship between Alberta and defendants and

therefore, defendants owed Alberta no duty with regard to the allegations in plaintiffs'

malpractice claim.  As noted above, to succeed in their malpractice claim, plaintiffs must allege

and prove that a duty ran from defendants to plaintiffs.  Stevens, 316 Or. at 227, 851 P.2d at 560.

There is generally no duty owed to non-clients.  See Lord v. Parisi, 172 Or. App. 271, 275, 19

P.3d 358, 360 (2001) (Oregon "adhere[s] to the general rule that only a client may sue his or her

attorney for malpractice"); Roberts v. Fearey, 162 Or. App. 546, 550, 986 P.2d 690, 693 (1999)

(lawyer owes no duty to protect economic interests of a non-client).  The court in Lord noted that

the Oregon Supreme Court had previously held that "a nonclient may not bring a malpractice

action against an attorney unless the attorney owes that person a duty that arises apart from the

foreseeability of the harm."  Id. at 279, 19 P.3d at 363 (citing Hale v. Groce, 304 Or. 281, 744

P.2d 1289 (1987)).

Additionally, non-clients who suffer "derivative" damages fail to establish a duty

sufficient to support a malpractice action.  See Or. Shiitake Tech., Inc. v. Kennedy, 118 Or. App.

575, 579, 848 P.2d 635, 637 (1993) (sole shareholder and director of two corporations could not

pursue malpractice claim where damages, as director, "would be derivative of damage sustained

by the corporations"); see also Proskaner Rose, LLP v. Blix St. Records, Inc., 384 F. App'x 622,

624 (9th Cir. 2010) (sole shareholder lacked standing to complain of injury to corporation;

diminished value of shareholder's shares insufficient to confer standing); Huang v. Claussen, 147

Or. App. 330, 334-35, 936 P.2d 394, 396 (1997) ("duties inherent in attorney-client relationship

will not be presumed to flow to third parties and will not be presumed to arise by implication")

(citing Clagett v. Dacy, 47 Md. App. 23, 420 A.3d 1285 (1980)).

24 - OPINION & ORDER

Under Oregon law, an attorney-client relationship may be formed absent an express written or oral contract. Kidney Ass'n of Or. v. Ferguson, 315 Or. 135, 146, 843 P.2d 442, 448 (1992). Payment of fees is not required. Id. Rather, the attorney-client relationship may be inferred by the conduct of the parties. Id.

To establish that Alberta had an attorney-client relationship with defendants by implication, Alberta must show that its

> subjective, uncommunicated intention or expectation [was] accompanied by evidence of objective facts on which a reasonable person would rely as supporting existence of that intent; by evidence placing the lawyer on notice that the putative client had that intent; by evidence that the lawyer shared the client's subjective intention to form the relationship; or by evidence that the lawyer acted in a way that would induce a reasonable person in the client's position to rely on the lawyer's professional advice. The evidence must show that the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client[.]

In re Conduct of Weidner, 310 Or. 757, 770, 801 P.2d 828, 837 (1990) (footnote omitted); see also Currey v. Butcher, 37 Or. 380, 390, 61 P. 631, 635 (1900) ("The relation of attorney and client is a personal relation, and can only be entered into by the consent of both parties").

The evidence in the record supports defendants' argument. Alberta was not a party to the LTSA, the arbitration, or the settlement agreement. The LTSA was an agreement between Hess Services and DG Cogen, executed in July 2004. Ex. 11 to Fox Decl. The demand for arbitration was initiated by Hess Services on March 3, 2006 against DG Cogen. Ex. 12 to Fox Decl. Norling is listed as DG Cogen's representative on the arbitration demand. Id. The arbitrator's October 1, 2008 interim award and December 17, 2008 final award listed Hess Services and DG Cogen as the parties. Exs. 17, 27 to Fox Decl. In his declaration, Norling states that he

25 - OPINION & ORDER

represented DG Cogen in the arbitration and that Alberta was not a party to the arbitration.

Norling Decl. at ¶¶ 3, 4.  He also states that Alberta was not his client with regard to the

arbitration or any other matters at issue in the instant lawsuit.  Id.

Defendants sent invoices for the work on the arbitration to "Simmax Energy (CA) LLC,"

an entity described as DG Cogen's "manager."  Ex. 39 to Fox Decl. (July 20, 2007 account

statement sent by Lane Powell to Simmax Energy, attention Eric Baty[8], for work on the "Hess

Arbitration"); Ex. 45 to Fox Decl. (May 2008 briefing submitted by Simmax in unrelated

litigation in California referring to itself as DG Cogen's manager and as an operator of property).

After leaving Lane Powell, Norling sent Simmax bills for legal services rendered to DG

Cogen.  Ex. 40 to Fox Decl. (March 2008 Invoice from "Renewable Counsel" to Simmax re:

"Legal matters pertaining to DG Cogen Partners, LLC" showing work performed in January and

February 2008 for DG Cogen, including review of the Hess settlement documents).  Lane Powell

withdrew from representing DG Cogen, not Alberta, in the arbitration.  Ex. 41 to Fox Decl. (Aug.

6, 2008 Letter from Lane Powell attorney Milo Petranovich to Brad Kruper of Simmax Energy

informing him that defendants would advise the American Arbitration Association (AAA) that

they were withdrawing from "the representation of DG Cogen in the pending matter," previously

identified as the "Hess Microgen Services and DG Cogen Partners Arbitration"); Ex. 42 to Fox

Decl. (Aug. 11, 2008 letter from Petranovich to AAA Case Manager enclosing notice of

_____

[8]  In his Declaration submitted in opposition to the summary judgment motion, Baty
states that he was a consultant to DG Cogen, its asset manager, vice president, and then president
from on or about mid-2004 until August 10, 2007.  Baty Decl. at ¶ 2.  A July 20, 2007 invoice
from Lane Powell for services connected to the "Hess Arbitration" was sent to Baty who was
addressed as the Executive Vice President of Simmax.  Ex. 39 to Fox Decl.

withdrawal of defendants as "counsel for DG Cogen Partners, LLC" in the arbitration).

In a May 2008 pleading filed by Simmax in unrelated litigation against DG Cogen and Simmax, Norling is referred to as having been "DG Cogen's counsel," not Alberta's counsel. Ex. 45 to Fox Decl.

As should be clear, all of the contemporaneously-generated documents indicate that only DG Cogen was defendants' client in regard to issues surrounding the LTSA and the arbitration. Additionally, defendants note that in May 2008, Lane Powell emailed Daryl Kruper regarding an unfulfilled promise by Daryl Kruper that Lane Powell would be paid in full by the end of April 2008. Ex. 44 to Fox Decl. In response, Daryl Kruper stated that "[t]he secured creditor has taken control of the assets and is now putting together a plan for the future of the assets. We understand you received a copy of the Notice of Foreclosure Sale. DG Cogen bank accounts were seized and are now in the hands of the secured creditors." Ex. 43 to Fox Decl.

As indicated above, Alberta was DG Cogen's secured creditor and obtained its assets through foreclosure in early June 2008. I agree with defendants that Daryl Kruper's response to Lane Powell's demand for payment is contrary to the existence of an attorney-client relationship between defendants and Alberta because there is no statement or suggestion that Alberta should or would pay or was responsible in any way for the outstanding fees. If Alberta had also been a client, some mention of Alberta paying the fees would have been made.

In response, plaintiffs point to the LTSA settlement agreement which they contend included broad releases not only by DG Cogen, but also by Alberta, against Hess entities. Ex. 17 to Fox Decl. at ¶ 3(b) (releasing claims "for itself and for its past and present affiliates,

27 - OPINION & ORDER

subsidiaries, parent companies, divisions, predecessors, successors, assigns, officers, shareholders, directors, agents, representatives, administrators, trustees, receivers, employees and attorneys, and each of them, and any other persons or entities who may claim through them"); see also id. at ¶ 3(a) (nearly identical provision for Hess).   Because, plaintiffs argue, the release included Alberta, Alberta must have been a client of defendants.

Plaintiffs' argument is unconvincing.  The release does not expressly name Alberta but instead is broad, boilerplate language meant to include any entity or person connected to DG Cogen.  Under plaintiff's reasoning, all of the categories of persons and entities listed in the release were defendants' clients.  But, that is an absurd interpretation of the language and is unsupported by the other documentary evidence discussed above.

Plaintiffs also rely on Bradley Kruper's Declaration where he states that based on the relationship between DG Cogen and Alberta and the fact that their interests were aligned, and based on his communications with Norling, he believed that defendants represented the interests of both Alberta and DG Cogen.  B. Kruper Decl. at ¶ 6.  He explains that he believed defendants represented both entities because (1) he had explained to Norling the relationship between DG Cogen and Alberta; (2) neither Norling nor Lane Powell told him that they did not represent both DG Cogen and Alberta or that the scope of their representation of DG Cogen or Alberta did not include a full assessment of all claims against Hess, Daewoo, or others; (3) neither Norling nor Lane Powell told him that Alberta should look elsewhere for counsel for these matters; (4) when defendants filed a counterclaim against Hess Services in the arbitration, Norling told Bradley Kruper that the counterclaim was the best means available to Alberta or DG Cogen to assert any

claims or defenses as to any Hess entity and also that the best way for Alberta or DG Cogen to recoup any losses would be to sue Daweoo or other non-Hess parties and that the filing of the counterclaim in the arbitration would not impair any such rights; and (5) the settlement agreement to which defendants committed DG Cogen included broad releases not only by DG Cogen, but also by Alberta[9], against Hess entities. Id. at ¶ 7.

Bradley Kruper's subjective belief does not establish an attorney-client relationship between defendants and Alberta. There are no facts supporting the requirement of an objectively reasonable basis for his subjective belief that defendants represented Alberta. While defendants certainly should have understood that Alberta was an owner of DG Cogen, that status does not make Alberta defendants' client. See Or. Formal Ethics Op. No. 2005-85, 2005 WL 5679675 (stating that "[a] lawyer who represents an entity, such as a corporation or partnership, generally represents that entity only and not its employees, shareholders, or owners").

Finally, plaintiffs argue that there is a "special rule" for determining whether an attorney-client relationship exists when one individual or entity owns another. In support, plaintiffs rely on In re Banks, 283 Or. 459, 594 P.2d 284 (1978), an attorney discipline case involving the conflict of interest of a lawyer who represented a closely held family corporation but who also drafted the employment contract of one of its shareholders.

Banks does not help plaintiffs because it addressed a different situation than is present here. While Alberta may have owned DG Cogen's assets and been its sole member, and the interests of the two companies may have been aligned, there is no evidence in this record that DG

---

[9] As explained above, the release language does not name Alberta.

29 - OPINION & ORDER

Cogen is a "closely held family corporation" or that anyone treated Alberta and DG Cogen as one and the same entity. As a result, there is no reason to deviate from the usual rule that a lawyer who represents a corporation does not have an attorney-client relationship with that corporation's employees, shareholder, or owners.

In summary, it is not enough for plaintiffs to articulate a subjective belief that defendants represented Alberta. Even construing the evidence in a light most favorable to plaintiffs, there is no objective manifestation of an attorney-client relationship between defendants and Alberta. The law makes clear that being DG Cogen's owner is not enough and <u>Banks</u> is distinguishable because the facts here do not show that DG Cogen was a closely held family corporation.

I grant summary judgment to defendants on this part of the motion. Alberta is not a proper plaintiff in the malpractice action because it did not acquire a right to bring the malpractice claim as a successor in interest to DG Cogen and it cannot bring the claim independently because it was not defendants' client.

Given my determination that Alberta cannot be a plaintiff in the malpractice case, and given my determination that DG Cogen cannot obtain damages for the sums it contends it would have received in the King & Spalding Action, I deny as moot defendants' third, fourth, and fifth motions which address whether the warranty and fraud-based claims asserted in the King & Spalding Action were viable when that Action was filed, and whether the loss of the claims against Daewoo and Advanced Power in the King & Spalding Action was caused by defendants' alleged negligence. However, because defendants' sixth and seventh motions raise issues regarding DG Cogen's claim for damages other than the sums potentially recoverable in the King

30 - OPINION & ORDER

& Spalding Action, I address those motions.

III.    Defendants' Sixth Motion:  Damages for Time Spent Working with Hess Entities
        re: Making the Cogeneration Systems Operational

Plaintiffs allege that as a result of defendants' malpractice, they suffered "many millions of dollars in damages that they would otherwise have been able to recover under or in consequence of the King & Spalding complaint, plus prejudgment and post-judgment interest." First Am. Compl. at ¶ 17.  In addition to the sums they contend they would have recovered under the claims in the King & Spalding Action, they also allege as damages funds spent working with Hess Services and Hess Microgen in what turned out to be failed attempts to make the equipment operate as represented and warranted and funds spent hiring King & Spalding to defeat the motion by Hess Services to impose the arbitration settlement.  Id. at ¶ 17b.

Defendants move against any attempt by plaintiffs to recover for funds they spent working with Hess Microgen and Hess Services to make the cogeneration systems operational. Defendants argue that any alleged negligence by defendants did not cause those alleged losses because defendants' alleged acts and omissions in 2006 came after Hess Services terminated all work on the cogeneration units in July 2005.

In response, plaintiffs clarify that they are seeking these funds as part of what they would have recovered under the specific claims in the King & Spalding Action.  They state:  "Plaintiffs do not allege that Defendants' malpractice caused them to work, with or without Hess, in failed attempts to make the equipment work successfully.  Plaintiffs allege only (and correctly) that the cost of their attempts to do so constitute consequential damages that could and would have been recovered in the King & Spalding Action."  Pls.' Resp. Mem. at 28.  Plaintiffs argue that these

damages are recoverable against defendants here in the malpractice case because they were recoverable in the King & Spalding Action.

Plaintiffs' response to the motion clarifies that paragraph 17b of their First Amended Complaint does not seek any damages beyond what plaintiffs contend they could have obtained in the King & Spalding Action. Because defendants' motion attacks claims to damages beyond what plaintiffs were seeking in the King & Spalding Action, the motion is moot in light of plaintiffs' clarification.

IV.    Defendants' Seventh Motion: Damages for Funds Spent to Hire King & Spalding to Represent DG Cogen in the Arbitration

As noted in the previous section, in paragraph 17b of the First Amended Complaint, plaintiffs seek damages for money spent to hire King & Spalding to fight against Hess's motion in the arbitration to enforce the settlement agreement. Defendants cite to deposition testimony from Paul Andre, the King & Spalding partner who approved of the fee arrangement between plaintiffs and King & Spalding, that plaintiffs agreed to pay King & Spalding $10,000 for time spent opposing the enforcement motion in the arbitration. Ex. 2 to Fox Decl. at 142, 182-83, 186. As a result, defendants move for summary judgment on any damages claim of more than $10,000 for time spent by King & Spalding representing DG Cogen in the arbitration.

Plaintiffs concede this motion and I grant it.

V.  Motion to Amend the Complaint

Plaintiffs move to amend the First Amended Complaint in two ways, one of which defendants oppose. First, plaintiffs move to amend paragraph 17a to add a reference to the sixth claim of relief in the King & Spalding Action, meaning the express warranty claim. Defendants

do not oppose the motion, which I grant.

Second, plaintiffs move to amend paragraph 14 of the First Amended Complaint to add specifications of negligence regarding defendants' failure to advise plaintiffs about the "desireability and/or legal effect" of the LTSA settlement and "the reasonable alternatives to settlement including the applicable statutes of limitation that might apply to those alternatives" and to add allegations that if defendants had not breached their duties to plaintiff, plaintiffs would have "timely filed and prevailed upon the claims about which they should have been advised." Ex. 1 to Pls.' Mot. to Amend. at ¶ 14.  Defendants oppose this part of the motion.

Federal Rule of Civil Procedure 15(a) provides that the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  The court should apply the rule's "policy of favoring amendments . . . with extreme liberality." DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987) (internal quotation marks omitted).  In determining whether to grant a motion to amend, the court should consider bad faith, undue delay, prejudice to the opposing party, futility of amendment, and prior amendments to the complaint.  Nunes v. Ashcroft, 375 F.3d 805, 808 (9th Cir. 2004).  However, the timing of the motion to amend following discovery and with a pending summary judgment motion, weighs heavily against allowing leave. Schlacter-Jones v. Gen. Tel., 936 F.2d 435, 443 (9th Cir. 1991).

Defendants argue that plaintiffs have unduly delayed in seeking the amendment; that the amendment will cause substantial prejudice to defendants; that the amendment is futile; and that plaintiffs have acted in bad faith.  They also note that plaintiffs have previously amended the Complaint.

33 - OPINION & ORDER

I agree with defendants that plaintiffs could have sought to include these allegations sooner.  However, delay, by itself, does not justify denying leave to amend.  <u>DCD Programs</u>, 833 F.2d at 186.  And, while the motion to amend was made while defendants' summary judgment motion was pending, defendants filed the summary judgment motion about five months before the dispositive motion deadline, while discovery was ongoing.  Fact discovery does not close until January 22, 2013, and the court retains discretion to extend the case schedule as necessary.  Additionally, while plaintiffs have previously amended the Complaint, that amendment was the result of a stipulation with defendants in which plaintiffs agreed to limit certain claims and allegations by withdrawing them.  Stip. to Limit Discovery, Claims, and Evidence at Trial (Dkt #29).  Under such circumstances, the fact of a previous amendment does not weigh against further amendments.

Defendants argue that they will be substantially prejudiced by the amendment.  They contend that they relied on the current allegations in forming their discovery efforts, that they will be required to engage in additional discovery, including subpoenaing individual Canadian non-parties in conformance with international law, and that the new allegations greatly expand the nature of the malpractice claim to include a "never-filed phantom case."  Defs.' Opp'n to Mot. to Amend at 7.

Defendants are correct that allowing the amendment keeps this case alive beyond the $10,000 in damages attributable to what plaintiffs spent to oppose the enforcement of the settlement agreement.  But, allowing the amendment does not change or alter the summary judgment rulings contained in this Opinion.  Thus, Alberta is not a plaintiff in this action and

34 - OPINION & ORDER

nothing in the newly asserted allegations of negligence changes that holding.  DG Cogen may not

prevail in this malpractice action on any claim brought in the King & Spalding Action because it

did not own those claims at the time the King & Spalding Action was filed.  Thus, any

allegations of damages based on the claims brought in the King & Spalding Action are dismissed

from the case and nothing in the newly asserted allegations of negligence changes that holding.

Defendants need no longer concern themselves with the King & Spalding Action.

       Plaintiffs' new allegations of negligence are not an alternative theory to obtain damages

caused by the loss of the King & Spalding Action claims.  Instead, in addition to the $10,000

damages claim, what remains is a claim for malpractice based on allegations that defendants

were negligent in their representation of DG Cogen in the LTSA arbitration by failing to advise

plaintiffs of alternatives to settling the arbitration and the statutes of limitations applicable to

those alternatives.  Plaintiffs will have to establish that but for defendants' negligence, they

would have pursued those "alternatives" when they were still timely and would have prevailed in

any action bringing those alternative claims.[10]  With this understanding of the new allegations,

and the ability to alter the current case schedule, defendants are not substantially prejudiced.

       Contrary to defendants' argument, the new allegations do not raise a futile claim.  I have

considered defendants' bad faith argument and reject the assertion that the timing of the motion

---

[10]  As defendants note, plaintiffs' proposed amendments fail to amend allegations in
paragraph 17 of the First Amended Complaint regarding damages.  The proposed second
amended complaint adds a new theory of negligence but still seeks as damages the "many
millions of dollars" plaintiffs would have been able to recover under the King & Spalding
Action.  First Am. Compl. at ¶ 17.  As should be clear from the discussion above, no damages are
available to either plaintiff based on the claims brought in the King & Spalding Action.  In
allowing the motion to amend, I order plaintiffs to also amend paragraph 17 to make the damages
sought consistent with the new theory of negligence asserted in paragraph 14.

35 - OPINION & ORDER

to amend evidences a wrongful motive.  I grant the motion to amend.

## VI.  Summary

Alberta is dismissed from the case with prejudice because it is not a proper plaintiff.  DG Cogen may not recover damages in this malpractice action for the loss of the claims in the King & Spalding Action.  Damages attributable to funds spent by DG Cogen to hire King & Spalding to oppose the motion to enforce the settlement are limited to $10,000.   As a result of the motion to amend, DG Cogen may pursue the malpractice claim to the extent it is premised on a theory that defendants were negligent for failing to advise DG Cogen of the existence of viable fraud or other claims while representing DG Cogen in the LTSA arbitration, and for failing to advise DG Cogen as to the statutes of limitations for those alternative claims, and that but for this negligence, plaintiffs would have filed timely fraud or other claims and would have prevailed in an action asserting those claims.

CONCLUSION

Defendants' motion for partial summary judgment [37] is granted in part and denied as moot in part.  Plaintiffs' motion to amend [55] is granted.

IT IS SO ORDERED.

Dated this _____ day of _____, 2013

_____
Marco A. Hernandez
United States District Judge

36 - OPINION & ORDER